Place 125-5109. Associated Press v. Taylor Budowich in his official capacity as White House Deputy Chief of Staff Head of the Affairs. Mr. Roth for the Affairs, Mr. Tobin for the Affairs. Good morning, Mr. Roth. Good morning. May it please the Court, Yakov Roth on behalf of defendants. Your Honors, the issues presented here are largely the same as the issues that were addressed by the State Panel a few months ago. Both the majority and the dissent on the State Panel laid out pretty comprehensively the conflicting approaches to how to apply the First Amendment in this unique context. We obviously think the majority got it right, and so we would ask this Court to now vacate the injunction for the same reasons as the Court previously stayed the injunction. You think the State Panel got it entirely right? I assume you're not giving up on the East Room. Not giving up on the East Room, but I think the State Panel's analysis and sort of analytical approach to the issue was correct. I think the way that shakes out for the East Room we can talk about, but sort of the overall approach that the Court took to the forum analysis and the other aspects of the doctrine, we think the Court got it right. Do you think that this was a close question? I think it's in some ways a novel question because most of the forum cases in the law have really dealt with the difference between a public forum and a non-public forum. And there are very few cases that address the distinction between a non-public forum and things that are not a forum at all. So I think it was sort of a novel question in that sense, but I think the way the Court approached that distinction was the right way to do it. Ms. Roth, so on the East Room, in your briefing, you make almost no specific arguments about the East Room, and the East Room wasn't addressed by the State Panel. And in many ways, the East Room is quite different from the Oval Office and Air Force One because it's used for many different purposes, sometimes with the President, sometimes without the President. There are all kinds of events that happen in the East Room. So I was actually wondering if you were just, you know, maybe not forfeiting exactly, but not really pressing the East Room argument. Maybe the East Room is more like the Brady Press Room. Your Honor, my colleague who argued this day, I think, said it was in between. And I think he's right, that it is in between. Now, it hasn't been the focus of the briefing, frankly, by either side. The case has largely been focused, as it was in the District Court, on the Oval Office and the comparable spaces. I think the similarities between the East Room and those spaces are essentially two. Number one, we don't have indication in the record that the East Room has been set aside for private speech, much like the Oval Office. We don't have that. Whereas we do have indication that the Brady Briefing Room and the press area as a whole was designated specifically for the press to do their work, including their own speech. So I think there's a difference between—I think in that respect, the East Room is similar to the other spaces. The fact, though, that the East Room really is used for myriad purposes. I mean, the Brady Press Room is used largely in a similar way for press briefings and questions with members of the administration. I mean, the East Room—I mean, if we were to reach the East Room, would we have to remand for further factual finding? I think it's very hard to have a single rule for the East Room, given its myriad purposes, which sometimes involve the President and sometimes do not, as my understanding, based on my experience. Your Honor, I think that's a fair comment. There is just not as much in the record on the way the East Room is generally used. The focus, again, has been much more on the other spaces. Now, I do think the AP could have, in their brief, said, even if you don't agree with us on the Oval Office, we still win on the East Room. And I don't think—they haven't litigated that way either. So I think neither side has really tried to break it apart. Take the East Room out of this litigation? Well, I do think that the most important aspects of this litigation do relate to the Oval Office and the spaces that are like the Oval Office. Can I ask you about standard of review, which is abuse of discretion, right? Are you familiar with Ashcroft v. ACLU and Gordon v. Holder? Ashcroft v. ACLU is a Supreme Court case from around—I think it's around 2012. No, earlier, 2004. Gordon v. Holder is from our court in 2013. But they're both cases involving review of preliminary injunctions entered against the government where there were constitutional claims, due process, or First Amendment claims. And the Supreme Court in Ashcroft v. ACLU said that in applying the abuse of discretion standard of review, if the district courts—if it's a close question and there's a reasonable argument that the district court got it right, you leave it in place and then you decide the question ultimately after there's been a full record and if a permanent injunction is entered. But what you don't do at the preliminary injunction review stage is decide those close questions where the record hasn't been fully developed. And we held the same in Gordon v. Holder. So why isn't this that case? So, Your Honor, I'm not familiar with the cases. I don't think the AP has made that argument here. At least, I don't remember that. We have to get the standard of review correct. For sure. We have to follow the Supreme Court precedent, don't we? You do. The parties, of course, make their arguments and the court responds to those arguments. I think ordinarily— So the party argues the incorrect standard of review, we apply that standard of review? And if the parties agree on it, sometimes the court will look past the issue and say the parties agree this is the standard. I think everyone agrees the standard is abuse of discretion. But abuse of discretion includes de novo review on issues of law. And I think the dispositive issues here are issues of law. How do we classify the Oval Office for purposes of form analysis? And more generally, is this the type of context where viewpoint neutrality is required? Or is this like the various other contexts where we allow the government to engage in viewpoint discrimination? That's the legal question that I think controls the case. I think review on that question would be de novo. And again, we think the State panel got that question right. Isn't it a close question? I mean, there was a dissent. The State level, there were two judges on whether we should review that en banc who indicated that they believe that the State panel may not have gotten it right. But at that point, it's not the point to go en banc. So there are at least three judges who believed that what the district court did was reasonable. Doesn't that make it a close question? Your Honor, I'm not sure if the close question analysis is really a factual inquiry. Like if what they meant, again, because I'm not familiar with those cases. But what they may have meant is if it's a factually close question, maybe we need more of a record. No, it didn't say factually. It said legally close. Close constitutional question. Your Honor, we think the answer is actually is clear as a matter of law. You said it's novel. It is not the scenario in which this arises is a novel scenario. But we think the court was correct. We don't, I'm not going to concede that it was close in that sense. I think it is novel. So not a lot of cases like this. But ultimately, the question is, when the President invites reporters into the Oval Office, is he creating a First Amendment forum? I think the answer to that is clearly not. Because they are not being invited to engage in private speech. That makes it unlike all of the forum cases, including the non-public forum cases that the AP relies on. And because it is highly selective, the White House is inviting particular outlets into the Oval Office. It is not a situation, again, like all the non-public forum cases, where an area is being held open more generally to a wider group. Let's do this in the retaliation context. Let's suppose there, when members of the public, families visiting from Kansas or whomever, seek to visit the White House, they go online, apply for the pass to do the White House tour. And once they run through all of that and they meet whatever those criteria are, the White House then reviews social media. And if a member of the group has criticized the administration, then their visitor pass is revoked. Does that violate the First Amendment retaliation? Is that a First Amendment retaliation claim? So, Your Honor, I think that if the White House has a system where people, it's generally open for tours, but you have to meet certain basic eligibility criteria, that looks more like the briefing room, where it opens all bona fide journalists. And once the government opens it to all bona fide journalists, they can't then impose additional viewpoint discriminatory restrictions on entrance. But I think that's very different from invitations. If the president wants to invite into his office a set of Republicans- I'm not talking about this as far as a viewpoint discrimination forum analysis. I'm saying First Amendment retaliation. Oh, yes, Your Honor. But I don't think you can actually split them apart, because I think if we're dealing with a context where viewpoint discrimination is permissible, then it doesn't really make sense to apply retaliation frameworks at all. I'm talking about, in my hypothetical, a family visiting from Kansas, and they are initially told you can come to the White House. Here's your tickets. When they show up, they're told you can't come in because you criticize the administration on Facebook. Does that family have a retaliation claim under the First Amendment? Your Honor, I think if they do, it would be because this is a context where viewpoint discrimination is not permitted because it's been held generally open. I'm not sure that's the answer, but I think that if that family did have a claim, it would be because the analysis would be the White House has made this generally open. By making it generally open, it's essentially created a type of forum. Once it creates a type of forum, it can't discriminate based on viewpoint, and therefore withholding that benefit based on viewpoint would constitute retaliation. That's not the way you argued it in your brief. The way that you argued the retaliation claim in your brief was that, well, there's no right to access the Oval Office or to be a part of the press pool, and because of that, there's no material adverse action that's happened against you for First Amendment retaliation purposes. Did I get that wrong, or is that how you argued it in your brief? I think you're right. What we said is there's no materially adverse action in that context. Your Honor, can I give an example that I think may help illustrate this? Well, I want you to stick with my hypo. Family from Kansas, if they're not allowed to come in, is that a materially adverse action against them or not? I think probably it's not, Your Honor, but the point that I really want to make is that there's no First Amendment retaliation claim for the family from Kansas. I think that probably is correct, but the point that I want to emphasize, if I can, is that the viewpoint discrimination and viewpoint neutrality distinction can't be taken separate and independent from the example of a situation where you have a job that, under Rutan, the government can make available only on a viewpoint discriminatory basis. A senior policymaking official, if somebody applies for that job and doesn't get it because they have publicly criticized the President, they couldn't say, oh, I have a retaliation claim, because we all understand that's the type of benefit that can be withheld on a viewpoint discriminatory basis, even though in many, many contexts, not being hired for a job is going to count for a retaliation claim. Your Honor, under Title VII- Retail debt, a prisoner can't be transferred to another prison is retaliation for exercising his First Amendment rights. Is that case wrong? Aren't we bound by that case? I think that's right, and I don't think- Do prisoners have a right to reside in a particular prison and not be transferred? I don't think it's about whether they have a right, but I do think the government could not assign people to prisons based on viewpoint. And so, because that is true, it is also true that they cannot retaliate based on viewpoint by transferring someone from one prison to another. But again, it comes back to, is this a context where we can grant or withhold a benefit based on viewpoint or not? If it is, then turning it into a retaliation claim, I think, then we're in the opposite position. So, just so that we're clear, in your view, the White House can deny members of the public from visiting and taking a tour on the basis of viewpoint, and that's not a First Amendment retaliation? Your Honor, I think that's probably right, but I think the distinction, the reason that case is different from this case is because in that case, in your Honor's hypothetical, the White House is generally opening up the area to tours, and so there would be a better argument by that family that by doing so, the government has created a type of forum that requires it to be neutral. Why does forum analysis have anything to do with it? What communication is the family engaging in when they do the White House tours? And your Honor, in that sense, it's the same. So, on that, I think there's two criteria that we're looking at when we're trying to figure out whether something is a non-public forum or not. One is, is it being open for private expression? And the other is, how restrictive or selective is the process? Those, to me, are the two criteria. I think your Honor's hypothetical is stronger as to one and is similar to our case as to the other. So, overall, it's a stronger case than AP has here and how it shakes out. But the family from Kansas still loses, in your view. I mean, if I had to take a position right now on that question, that's what I would say, but I think they have a better claim than the AP does. Woe to the public. Excuse me? Woe to the public. Well, you know, if the President wants to invite particular people into the White House because of their political views, I think the President is allowed to do that. The President routinely invites Republicans and not Democrats into the Oval Office for ceremonies. Nobody thinks that he has to extend those invitations on a viewpoint-neutral basis. I think for the same reasons, he can invite favored reporters and not disfavored reporters to watch that ceremony in the Oval Office. So, the District Court found that the Associated Press, when they are operating as part of the press pool in the Oval Office on Air Force One at Mar-a-Lago, was engaging in communication, that they're practically live streaming, that they are communicating with their editors, asking questions, breaking news, found those things as a fact. I didn't see anywhere in your brief that you challenged those findings of fact. Correct. Did you challenge those or not? No. Okay. So, none of those facts are challenged. We have not challenged those facts. So, then, why isn't that dispositive on the issue as to whether or not they are engaging in communication when they are part of the press pool? Your Honor, I think they're engaging in communication. Our point is that that communication is not tethered to the physical place. So, it may well be that when they're in the Oval Office, they're texting. They can also do the same thing an hour later when they leave. The purpose for which they're being invited in is to observe, to have access to that information. And so, we think, for that reason, this case is better analyzed as an access to information case like Baltimore Sun and not a forum case where, ordinarily, with a forum, you are being invited in and the speech is happening in the forum, and that is the purpose of the forum. So, it is- What about the Brady Press Room? So, the Brady Press Room is part of a broader complex in the White House where the journalists and reporters are doing all sorts of speech activity. They're asking questions. They're doing interviews. They're typing up their stories. All of that is happening in that space, and that is what the space has been designated for. The District Court found that they asked questions when Air Force One. They asked questions in the Oval Office. That's not the way the AP is litigating the case, though. They're disclaiming any interest in asking questions or speaking because they recognize that if, when they go down that road, they are running into government speech interests on the other side. So, they have not claimed they have a right to ask the question and have it be answered or have any sort of interactive exchange with the president. Well, there's a difference between saying you have a right to have your questions answered and just acknowledging, I mean, no one, when they're in the Brady Press Room, has a right to have their question answered. That's right. But what happens there is that they are observing whatever the president or the press secretary or whomever is saying. They're reporting on that, and then they may or may not ask a question. It may or may not get answered. Why isn't the exact same thing happening if you are part of the press pool on Air Force One? So, Your Honor, there are two differences between the press area and briefing room on the one hand and the Oval Office and Air Force One on the other. One that we've talked about a little bit is what is the designation of the space for? And I think the designation of the press area is much broader and encompasses a wider range of speech and private expression than the Oval Office. But the second is the selectivity. So, the way the briefing room works in the press area is as long as you meet a certain basic eligibility threshold, you're allowed in. And so, that gets it into the non-public forum category under forum analysis. That is not true anymore, at least, of the Oval Office or Air Force One. That is by invitation only. The president is extending the invitation specifically to the people he wants to include. That is inconsistent with the notion of a forum. So, I think that's one difference. I will say, though, they are— the White House adopting a new and different approach for the press pool. But the district court didn't rely on that in entering the preliminary injunction, did it? I think it did, Your Honor. I think it's been conceded throughout that the president and the White House is allowed to change the sort of structure of the way the pool works and that nobody was challenging, for example, the insourcing of the selection. So, you know, it used to be done by the Correspondents Association. It's been outsourced to them to pick. White House brought that back in and said, we're going to decide day-to-day who we're inviting. And nobody has said that that's not allowed. And the whole case has been litigated on the premise that that much was permissible. So, then we're at the point of analyzing what are the implications of that for forum analysis. And that level of selectivity is inconsistent with any type of forum. But this is—my point is, is that why does that make any difference on the legal question, whether it's the White House Correspondents Association or the White House itself designating who is in the press pool? Because, Your Honor, if the White House is choosing who to admit on a very selective and restrictive basis, then it is not—the forum principles, even from the non-public forum cases, don't apply because it's not a situation where it is being held open in any sense. It is purely a matter of invitation. And when it's a matter of invitation, we don't apply viewpoint neutrality principles. For example, the White House wants to hear from advocates on one side of an issue. It can invite them in to make a presentation. It doesn't have to let the other side in to make their presentation, right? So, when you're dealing with that sort of invitation selectivity, we don't apply the same viewpoint neutrality rules as we do in forums, even non-public forums. So, the White House could, for the annual Easter egg roll, send out invitations and send out invitations only to the members of the public whose speech it agrees with and reject others, and there'd be no First Amendment problem. Your Honor, I think that's clearly true. I mean, there are events all the time at the White House, parties, receptions, ceremonies, where the President is going to be, and the White House is going to be inviting people based on political affiliation, where ordinarily, under the First Amendment, in many contexts, you can't discriminate based on political affiliation. But nobody's going to come up here, I don't think, and say, yeah, the President has to invite equal number of Republicans and Democrats to the Christmas party. That's because it's not a forum. Mr. Roth, can I ask you, in your brief, you talk about the fact that the injunction restricts the President from making his own decisions. The injunction here, though, is not at least formally directed at the President. I mean, is there—I mean, you know, if the staff, the White House staff, were to follow the injunction, but the President chose to say, you know, I don't want you here in the Oval Office, what would be the consequence of that? I mean, is this injunction here effectively an injunction against the President? Well, I think it means that the White House staff can't follow the President's directives while also complying with the injunction. And so that is— So is that an injunction against the President? I mean, in form, it's not. The government seems to perhaps allude to that argument, but not make that argument in the brief. And I'm wondering— I don't intend to be making that argument. I mean, there's this general rule that, you know, the courts don't enjoin the President directly in the execution of his duties. And the courts generally do that by just carving out the President from the scope of the injunction and telling everyone who implements the directives to follow the injunction. And nobody has a problem with that. Does that fiction really work when we're talking about White House staff who are directly working for the President, who are, you know, assistants to the President, deputy assistants to the President? I mean, it might work in the context of an agency, you know, much more removed from the White House. Well, certainly, it's certainly true that this is much closer to the President's own personal prerogatives and decision-making. And so it is more sensitive in that way. And I think, as the state panel discussed a few months ago, leads to much more difficult compliance questions and administrability questions because we start to get into debates, factual debates over, you know, why did the President choose A instead of B? How are we going to figure that out? Who are we going to call in to make that determination? So I think for all those reasons, this is more fraught than in the ordinary injunction. It seems AP can't really get the relief it wants without an injunction against the President because the President controls who enters the Oval Office and Air Force One. And if the President says, I don't care what my press secretary says, I don't want AP on my plane, I don't see how the injunction can actually get AP what it wants. I just don't see how that works. It would lead to a lot of conflict within the White House, I think, is maybe Your Honor's point. We don't want the President's assistance. It would lead to conflict in the White House. I think, I mean, if the President said, I don't want someone on my plane, I don't want someone in the Oval Office, my office, my personal office, I'm not sure. I take the point, Your Honor. Well, if that's the case, then why isn't any injunction against the Cabinet Secretary or any executive official problematic? Because the President could disagree and order the Secretary of Health and Human Services to, you know, grant that Medicaid exemption to that hospital when we don't care what the court says. Your Honor, I don't want to put words in Judge Rauh's mouth. I think the point that she was making- You agreed with the point, so tell me why my concerns about the point aren't- I think the point that she was making was that these decisions that we're talking about are much closer to the President personally, right? He is in his office, he is getting on his plane, he is making decisions about what is happening in his immediate vicinity, and that is unique. I mean, we've seen a lot of injunctions over the last nine months, but this one is unique in how close it gets to the President's own space and his personal decision-making. Part of my argument is that either you can enjoin the President and tell him that he must let AP into his office, or the President can decide who he lets into his office. It has to be one or the other, and it's not the same thing when you're talking about a cabinet secretary following the law or some statutory requirement. Well, Your Honor, thankfully, I think that even apart from that, the injunction doesn't work as a matter of law because it gets the First Amendment principles wrong, and specifically gets wrong when we apply the principle of viewpoint neutrality and when we don't, and the line between a non-public forum and something that is not a forum at all. And for those reasons, we think the injunction should be reversed. Do you really want room-by-room, space-by-space jurisprudence? It seems to me what this case is all about is access to the President. I don't know why, if you start with the proposition, like, the Oval Office hosts any number of different events, bill signing, press conferences, rallies, meeting with the head of state, and the press might or might not be in there, and the President gets to decide that. And it's really different if the event is moved from the Oval to the Rose Garden or the East Room or somewhere else. And President Trump, Inauguration Day, had an event at the Verizon Center. I mean, I assume people who got those tickets were supporters and not opponents. And if he did a press conference at those events, probably the reporters he's talking to were supporters rather than opponents. Your Honor, I don't want to be too categorical because I do think part of the analysis turns on how the government is itself treating the space and treating access to the space. So, if the President did a briefing in the Brady Briefing Room, then I'm not sure we would have the same arguments because of the way the government itself has set up that space and allowed access to that space. Well, I think under this Court's decisions... I know you have Eteba, and you need to distinguish that, but Eteba and Sheryl are about hard passes, and there are about 1,300 journalists who get them, and there are about 50 seats in the Brady Briefing Room. I'm not sure those cases stand for the proposition that access to a presidential event in the briefing room can't be curated. Your Honor, we haven't pressed that because, factually, the White House hasn't tried to press it that far. The White House has accepted there is this area within the building that is generally open. Once we say it's going to be generally open, we're stuck with that, and therefore we have a viewpoint neutrality rule that attaches. All we're saying is that that doesn't carry over to areas that are not generally held open for private expression, including voters. I want to make sure I understand your argument and the distinctions you're making. So are you agreeing that the White House... it would violate the First Amendment for the White House to revoke a hard pass because of disagreement with the reporters' coverage or reporters' company style guidelines? Yes, Your Honor. And why do you agree that that would violate the First Amendment? Because those passes have been made available on a generally open basis to everyone who meets the threshold eligibility of a bona fide Washington journalist covering the White House. And under this Court's cases and the Supreme Court's cases, once the government opens up a space, either physical or metaphysical, on that sort of generally open terms, then it becomes a non-public forum, and therefore viewpoint discrimination is not permitted. And so this Court applied those principles in a TABA and said that covers the hard pass system. The question here is, does that carry over to spaces that are not generally held open? And they're certainly not generally held open for private speech, like the Oval Office. We think the answer to that is no. And isn't it also the First Amendment retaliation claim, separate and apart from whether it violates the First Amendment under forum analysis? I don't think it's... I don't think that the label changes what's fundamentally driving the outcome. So if we're dealing with the press pass, you could call that a retaliation claim rather than a viewpoint discrimination forum claim, and it would apply exactly the same way. Meanwhile, if we're talking about somebody who's invited into the Oval Office to make a presentation about, let's say, a pro-Second Amendment presentation to the president, then an anti-Second Amendment advocate couldn't bring a claim and say, oh, I didn't get the same invitation I was retaliated against. We would say, no, that's a context where the viewpoint discrimination is allowed by the First Amendment, so you have neither a forum claim nor a retaliation claim. Well, I thought a few minutes ago you said that the family from Kansas, if they were initially accepted to take a tour of the White House, but then were told when they got to the gate, you can't come in because of your social media criticism of the White House, that that wouldn't pose a retaliation problem. So that, because the tour itself is... I'm not sure that getting the tour or not getting the tour is going to even meet the sort of minimal threshold for any retaliation claim. So I think there's kind of two ways a retaliation claim might fail. It might fail because you're allowed to do viewpoint discrimination. It might fail because it's just not the type of action that can qualify for retaliation at all. Like, if I make an angry face at somebody, that's not enough for retaliation, right? The tour, I'm not sure if it rises to that level. You think that what you're arguing now comports with the Supreme Court's decision in Wilson? In which case? Wilson. It's the one you rely on in your brief, I believe. It's the Supreme Court decision. I mean, for retaliation purposes, I know we invoke the Supreme Court's decision in the Houston Community College case, which says when you're trying to figure out whether an action is materially adverse... Yeah, Houston Community College v. Wilson. Yeah, you look at the sort of historically, how has this been treated, and make the evaluation in light of that, those sort of background norms. And I think our argument is entirely consistent with that, because especially when you view this case through the access to information prism of what is the historical relationship between the president and the press with respect to information? And I think that's actually an area where the merits briefs have a lot more to say than the state briefs did about that historical relationship. And I think it makes it quite clear that presidents have always treated access to information as both a carrot and a stick with the press on viewpoint discriminatory terms. And that, I think, further supports our point on retaliation, which is that this is just another instance of that sort of relationship, and therefore it's not... Wilson said that if distinguished that case from an instance where the government prevents the person from doing their job, and distinguish that case, which was a censure of a legislative representative from cases that are aimed at private individuals, and in the sovereign taking action against private individuals, and uses the example of the citizens for their participation in that that was quashed by James Madison and others. So why isn't... Why isn't whether you... When the district court finds that the AP is inhibited from doing their job, and in fact, that's the precise reason why they're being punished this way, you don't generally impose punishments that don't hurt, at least I don't. So why isn't this square on what Houston Community College v. Wilson is talking about? Your Honor, I'm not making the argument that it doesn't hurt. What I'm making... The argument that I'm making is that journalists and reporters need information to do their jobs, right? They all need information. They want information. The more information they have, the better they can do with their jobs. And yet, it has long been the case and accepted that elected officials can give and withhold non-public information to journalists on a viewpoint discriminatory basis. That's why we have the interview example, but not just interactive. It's not limited to interactive episodes. Things like leaks of information, things like exclusives, heads up, call somebody and return somebody's calls to answer a question, right? All of these things are ways in which the government, the public officials can selectively provide access to information to favored journalists. And that has been happening as our brief develops, I think, greater length for a very long time. And nobody has thought that that violates the First Amendment. And so against that backdrop that Baltimore Sun talks about at length, against that backdrop, this type of selective restriction on access to information is not properly considered a materially adverse action for First Amendment purposes either. All right. Thank you. We'll give you some time on rebuttal. Thanks, Your Honor. Mr. Tobin, we'll hear from you. Thank you, Your Honor. Charles Tobin from the law firm of Ballard Spar, along with Max Michigan, Sasha Dunning on behalf of the Associated Press. Your Honors, I think Judge Wilkins, your question was very apt in terms of what is the standard of review here. Obviously, we have had numerous judges weigh in on this case. And as the court pointed out, Judge Walker wrote a decision on bottom concurring as a matter of procedure in the denial of review. But he did write that the trial judge wrote a forceful and persuasive opinion and that the court ought to give it due course and due reason. Your Honor, that makes this particular argument whether to reverse the injunction wholesale very different from the state panel's setting. We've now had several judges take reasoned and opposite positions based on their own views of whether it's an access case or whether it's a retaliation deprivation case. That makes it, at least in the minds of this court, a close question of law. And that requires a higher level of protection for the district court's decision Your Honor, we believe and we ask that the district court, that you agree with the district court that the First Amendment does not stop at the Oval Office door. This case is governed by Sherrill and Atiba and Karam. We have a well-reasoned line of decisions that say that once you have a system that allows the press into a certain location, whether it's the White House or in Sherrill, whether it's Karam, the Rose Garden, or whether it's Atiba, the Brady Press What's the system here? I mean, the White House is now choosing who gets to observe the President in the Oval Office and Air Force One. What's the system other than these are people who we have decided we will favor with access to the President? Your Honor, to ask the question the way you have asked it answers the question with all due respect. The White House now has a formalized policy. It was established on April 15. It's written down. It's two pages. It has multiple points. In assuming the obligation, the responsibility for keeping the gatekeeper for the press, the White House has now directly taken on the obligation to abide by the First Amendment in making those selections and whether this case is decided on a viewpoint on a public forum basis or a discrimination basis or a Fifth Amendment basis, the First Amendment commands no viewpoint discrimination and the White House press policy. AP has conceded that the President can discriminate on the basis of viewpoint with respect to interviews or who he chooses to meet with and AP tries to draw a distinction between physical access and personal access. But where the President is in his most, you know, sort of his own personal spaces like his airplane or his office. I mean, don't those two things collapse? I mean, how do we distinguish between just physical access and personal access when someone is within 10 feet of the President of the United States? Your Honor, they are not his personal space with all due respect. Those are the paid for by the taxpayer people's offices that the government is conducting government actions for the people. I mean, of course they are owned by the government, but the President has, I mean, he's the head of the executive branch and this is his office that is given to him, you know, by Congress and by the government to do his constitutional duties. And you think that's the same as the Brady Press Room? I think AP speaks to that directly in dividing the government spaces in the White House between the President's living quarters on the one hand and government offices on the other hand. And just like the President is not above the law, the Oval Office is not a First Amendment banned forum for the purposes of conducting the government's business. When the President invites the press pool in, he is operating under a regular government system. And I think the government in its argument, my friend on the other side, conceded his case when he said, if the White House has a system open to all bona fide journalists, that looks more like the White House briefing room. And that is exactly what the press policy has been since the Eisenhower administration and is now being run directly by the White House. It is a government system for allowing a group of journalists that is specifically defined in the policy as the pooled into any space where the President is conducting business. So you're backing off all of the concessions that you made at the prior argument? I'm not. You said at the prior argument, the White House can choose to admit one favorite journalist or five or 20 to the Oval to access the President. I was acknowledging that that's the law under Sherrill. And I was acknowledging that the White House can do all of that on a viewpoint basis. That's what Sherrill says. Sherrill says this case does not involve the right of the President to speak to whomever he wants to. But the Sherrill case, which governs here, and the only way the government wins in this case is if this panel were to overrule Sherrill Karam and a table with a specific. So you need in order in order to prevail, you need for there to be a First Amendment distinction between Oval offices, Oval Office events, depending on who is going to speak to whom. If the reporters are going in with an expectation that they can ask questions and have them answered, the president gets to pick if they're going in to be silent and observe. First Amendment attaches. No, Your Honor, I would say the distinction is if it's a pool event, which we now have as a defined thing under regulation directly by the government. If it's a pool event, then the president cannot pick and choose people the way he could. If he's inviting an individual, he can make he can make ad hoc judgments about whom to come in to a particular event. That is the law of this circuit, that it's a particular event. He can't do that. He can't memorialize on paper a rule that we're just we're going to pick reporters based on who we think is appropriate to the event at hand. That is not what this pool system is, and that is the law under Sherrill, that once there is an established system, whether it's a hard pass system or a pool system, there is no principle distinction as a matter of law between those two, unless we're going to stop the First Amendment at the Oval Office door. And that is that just makes that that is not a principle on which I think this court should rest. That is not consistent with the applicant. How does the president, on your view, given what you say is an established system, how does the president get to pick who will come in the Oval Office for an event on a viewpoint discriminatory basis? Because it's not a pool event. If he's sitting down with Tucker Carlson and having a one on one interview, that is not an invitation. Suppose he has a foreign head of state in the Oval and he wants a couple of reporters to observe it, but he doesn't want reporters who might ask the foreign head of state an embarrassing question. Can he do that? If it's a one on one or a two on one or a three on one or a 10 on one? Yes, Your Honor. But if I may, that is the law in Sherrill. And I can't ask this panel to overrule Sherrill. It doesn't have the authority to do that. That is that is the mundane practice of individual. That's the historical and mundane practice of individual interviews. That's one thing. We also have a historical practice with its antecedent roots in the Garfield administration, but being formalized during the Eisenhower administration, we've had 70 years of experience under a system called the press pool and a defined set of events. The White House sends out emails every night defining who the members of the pool are going to be for the next day. That is an established government system. That looks an awful lot like the mailbox in the Perry case or the CFC flyer. And so your whole argument turns out the press pool being a system. I mean, the system has changed over time. I mean, it was run by the Correspondents Association. Now it's run by the White House. I mean, it's not it's not some fixed thing. The well, it has changed in its in some of its changed in its who is part of it, how it is selected, who does the selection. I mean, these are the key components. I mean, there's no historical practice of a fixed press pool. That's AP's primary argument. Then I don't I don't see how well a form is defined by historical precedent, historical antecedent, who get whether it's people are allowed in to speak and whether it's governed by a reasonable and viewpoint neutral criteria. That's what happened in the Perry case. That's what the mailbox system in the Perry case. That's the second class mail system in the Hannigan versus Esquire case from the United States Supreme Court. You have the government establishing a system, and it may change in dimensions from time to time. But in every case, it must be administrative. If it is a government program, which this is, it must be administered in a content neutral viewpoint, neutral and reasonable. So there's an event scheduled in the oval. Does the White House get to designate that event as press pool or something else? They do it all the time, Your Honor. That's routine practice. Are they bound by viewpoint neutrality when they make that designation? We are not arguing for viewpoint neutrality when it comes to individual decisions. They just designate the event as a non-press pool event. We're not arguing that if it is not, this case is strictly being argued under the facts of the press pool case and under the undisputed findings as the district were made. It sounds like a jurisprudence of labels. They call something the press pool. The press pool is just a mechanism for allocating space in the oval or on Air Force One. Well, it's a defined government program. The public forum doctrine is jurisprudential labeling, right? You have traditional, you have limited or designated public forums, and then everything else is a non-public forum. If you win on that theory, the next day the government will stop, the White House will stop designating things as press pool events. We might have something to say then under our retaliation claim, Your Honor, if it is done to cut off the AP's right to call it the Gulf of Mexico during the middle of this litigation. We also might have some things to say about it being retaliation for this litigation as we did in our amended complaint. So it would not end the inquiry for us if the White House were to do that. I'm only acknowledging, Your Honor, that the president does have a right, as it says in Sherrill and is established law in this circuit, that the president can make individual decisions. It's also established in this circuit that if the White House has a hard pass program or admission for all journalists to the East Room or the Brady Press Room, he must not discriminate based on viewpoints. That's a doctrinal question. So you said that everything else is a non-public forum. I mean, do you agree that there are some government spaces that are not fora at all? I agree there are spaces that when they're used for certain purposes are not government, are not public fora. Can you give me an example of what would be a non-forum government space? Well, I would say that analytically, I would argue that they're all non-public forum because of the everything else. Is my office a non-public forum? Is a member of Congress's office a non-public forum? Certainly, if it is used, if you were to hold a hearing in your office, and I've had this experience, Your Honor, with trial courts holding in-chambers hearings, the First Amendment follows the ceremony of the proceeding. So if a member of Congress is holding a pool event in their office, then certainly, it falls on public law. If a member of Congress is meeting with a handful of journalists or making an announcement in their office, viewpoint neutrality attaches to that space? Not if it's an individual invitation-only event that's the functional equivalent. But that distinction doesn't, I mean, how do we decide what's a pool event and what's an invitation-only event? I mean, as Judge Katz has said, it's a jurisprudence of labels. I mean, that's all we have to go by at this juncture, Your Honor. If the injunction were to hold, the president could not eliminate from, and it's a very narrow injunction. It simply says, events open to all press, the AP cannot be excluded based on viewpoint. And that's a simple holding. I think the judge, as Judge Walker and Judge Pan agreed with him, said, it was a forceful, eloquent, but it was also a very narrow remedy. And the remedy is simply that if it's an event open to all journalists in a pool or otherwise, but it's the East Room in the Oval Office, you cannot discriminate based on viewpoint. Let me ask you about the remedy. So is this injunction effectively an injunction against the president? So it's formally against his staff or members of his staff. So if the president chooses to say, well, I understand my staff has allowed AP in for this particular event, but I would prefer that they're not here. Please leave my office. Then what happens? Well, we took our cues from Judge Tatel's decision in the Karam case, which upheld the injunction in that case, except he carved out the president for reasons of respect, I think, for separation of powers. If I remember how- Oh, that and the Supreme Court precedent saying you cannot enjoin the president. And so, Your Honor, I would say, first of all, on the other side is right. The White House could not execute the president's orders without violating the injunction if you uphold the injunction. And that makes it a very practical problem for the White House. And certainly we would be in court if the White House press secretary, despite an injunction, said the president has ordered me to do this. And I am going to carry it out. What if the press secretary isn't doing it? The president simply escorts out the disfavored journalist from his office. Now what? Now can you go back to court? And force that? I presume the people escorting him out would be the White House staff. The president just, you know, walks into the door, sends him into the hallway and says, please, you are no longer welcome in my office. He's a pretty big guy. Yeah. You're back in court before the district court saying, now we want an injunction against the president? No, I would say we want an injunction against the White House staff not to follow the president's orders. And we would work- They haven't done anything. They haven't done anything. The president has simply escorted a journalist out of his office. The staff just stand by. Then I would be on the phone with White House counsel's office. We would have a spirited discussion about whether we needed the court's intervention. And we would be back in front of the court saying there cannot be life given to this injunction. You eventually need an injunction against the president for this to work, don't you? I don't- In his office and on his plane. I mean, ultimately that's, I mean, for it to really stick. Is that what you need? I don't think so until the president decides to disobey the spirit and the First Amendment and decide that he is above the law. The president is not above the law. No, he is not. The government is not alleging that the president is above the law in any way. I would expect him to respect a ruling in this court that says the government may not discriminate on the basis of viewpoint. Yes, I would expect the president to observe and respect the decision in this court that says that. Do you think there's any problem, though, with the fact that for something like this to work, where there is physical and personal access to the president of the United States, it suggests at least some reasons why an injunction like this is inappropriate? No, Your Honor. Not if we start with the proposition that, number one, the propositions that the president is not above the law, that the First Amendment applies to the executive branch, restricts the authority of the executive branch. Everything else does not depend on the specific physical situation. It depends on whether there is an established system like the press pool that allows you into the Oval Office. The intimacy of the space doesn't matter any more than the restrictions on Guantanamo Bay in the Nation Magazine versus DOD case. The court held that restrictions on access to Guantanamo Bay had to be applied to the press viewpoint neutral, that flights to China during the Red Scare, which were limited to journalists, according to Judge Berger, Justice Berger, when he was on this court, could not be meted out to Republicans or Democrats. They had to be assigned in a viewpoint neutral way. And so either we believe in viewpoint neutrality wholesale or we write it out of the law completely. It is not a situational ethics, not a situational specific pattern that drives these. It's the overarching and, as of now, unbroken line of precedent that says that the government cannot discriminate on the basis of viewpoint in meting out any right, benefit, or privilege. And as my friend said on the other side, that's really what we're talking about here. Could I ask a few questions about retaliation? So you have a three-part test which turns on whether there's a materially adverse impact. And that sounds like a very good test for you, and it generally applies to denial of  But I wonder if it needs to be qualified in the very limited contexts where viewpoint discrimination is permissible. I think that was Mr. Roth's theory. So just take a case where viewpoint discrimination is permissible. Presidential speech. President gets in a tussle with a reporter whose viewpoint the president disfavors, and he speaks to the nation and says, this man is a scoundrel and don't listen to his opinions. He can do that, I assume, right? He's done it twice in the last week, right?  He called the Bloomberg reporter piggy, an offensive phrase. He did it on national television. He did it in Air Force One, not in the residence of Air Force One, but in the press section where he chose to come back and engage with the press during a poll opportunity. And you wouldn't say that that reporter could bring a retaliation claim and prevail by invoking the three-part test and showing a material harm to the reporter's business? By calling her an offensive name? No, Your Honor. I think that's a law that the executive can speak offensively, as offensively as he likes. And this president does that routinely. So that's one. Take another one. One-on-one access to journalists for interviews. You've conceded, I think you still say, the president can make those decisions. That is the law of Cheryl versus. So a journalist is scheduled to come in for an interview the day before the journalist criticizes the president. The president cancels the interview. No retaliation claim there, I assume, right? I think it's a closer question, Your Honor. I would not advise my client on that single event to bring a retaliation claim. If they were then excluded from the pool and they had been assigned to a pool rotation, I would be back here making that same argument. Well, Baltimore Sun decided sort of under the three-part test where the court says, gosh, reporters are tough and they won't be deterred and they shouldn't be deterred by denial of access. Suppose there were a district court finding in Baltimore Sun that reporters are chilled if they're denied the access in that access to government officials. Retaliation claim? What I'm playing out in my head is you're asking me if the court found as a matter of fact reporters were chilled or as a matter of law it constitutes unconstitutional. I mean, I'm suggesting that Baltimore Sun really, and I think Houston Community College with a censure, really they stand for the proposition that there are certain kinds of government actions that don't have to be viewpoint neutral. And when you're talking about those actions, no retaliation claim when the government does the viewpoint discrimination. We know in the city of Heffernan versus Patterson, New Jersey, a police officer was demoted for the chief erroneously believed that he was carrying picket signs or campaign signs for his opponent. The Supreme Court found a valid retaliation claim in those circumstances on the theory, the legal hook, that it would chill other officers from exercising their First Amendment rights. So the chilling effect, and that's from Elrod versus Burns, the chilling effect on others is very relevant. In this case, we don't need to look to others. We can, we can look directly at the record. The Associated Press has lost revenue. Sorry, who's? No, I'm spotting you that. I'm spotting you. I'm just wondering whether it matters. And who's the plaintiff in the case you just mentioned? If it's a low-level government employee, sure, you can bring a retaliation claim because that employee has a First Amendment right not to be discriminated against in government employment based on his viewpoint. What about the Secretary of State? What about the tools for rod case that Judge Wilkins asked about? That's this circuit's law that involved a prisoner who has the least amount of rights of just about anybody in society. That prisoner, because they were practicing the Hindu religion, was being discriminated against and got transferred to another prison. And this court found. And nobody thinks viewpoint discrimination is permissible in assigning prisoners to prisons. I'm sorry, I didn't hear your question. Viewpoint discrimination in that context is impermissible. It is impermissible. So I'm answering your question about the low-level. Is the doctrine, as I understood your question, is the Heffernan doctrine limited to low-level government employees? I was picking another fact pattern that is the law in this jurisdiction that applied to somebody who has the lowest level of protections. Yeah, but I'm asking you, but my concern goes to the high level. The high-level government employee who doesn't have a right not to be subjected to viewpoint discrimination. And the question, Your Honor? Suppose a cabinet secretary is fired for that person's viewpoint, retaliation claim or no? I think that there, the president has greater authority when there are people who speak for his policy. And I agree with my friend about that. President can discriminate in that context based on viewpoint. And therefore, this is what I'm getting at. And therefore, that person has no retaliation claim based on the viewpoint discrimination. I think that, I think they're more restricted than the first, than the press, than the rights reserved to the press under the First Amendment and the doctrine of this court in Sheryl Atteba and Karen, which this court obviously would need to overrule if it were going to the government.  Thank you, Your Honor. All right. Thank you. We'll hear from Mr. Roth. You're out of time. We will give you three minutes. Thank you, Your Honor. So it sounded to me from counsel's argument like what was hinging on giving pretty talismanic significance to the use of the word fool. And I don't really think that that makes sense. The fool is just the name for the people who are being invited in. And the question is not, the First Amendment shouldn't turn on that word. It should turn on the substance of what it represents. But I thought your argument was that forum analysis is based on location, situs. No, I think it's based on two things. And the one that's relevant to what counsel was referring to is this question of selectivity. Is it open or is it selective? If it's selective, it's not a forum. And the pool, as it's currently constituted, as Mr. Tobin said, it's just the list that the White House sends out the night before that names the people who are invited in. That is the most selective regime one can have. They are dictating who can come in and who cannot by name. And in that circumstance, there is not a forum. It is just an invitation to those people to enter. Just to give sort of an analogy that I was thinking about, you know, if the White House had a system where they said every Sunday morning for two hours, we're going to let citizens come and present petitions to the president on whatever they want. That might be a forum, right? They're saying, come, private speakers, have your chance to speak. It's generally open. If they've said, however, we're going to do this presentation where we're going to invite people to make presentations to the president, they could choose the topics and viewpoints of those presentations. So as with much of forum doctrine, it turns out to be a little bit of sort of truth in advertising rule, right? If you are holding it open as open, you need to actually walk the walk. If you are overtly picking and choosing, we don't have a First Amendment problem. And I think that's the sort of the core of why this injunction should be reversed. And thank you, Your Honors, for the time. We would ask the court to reverse the injunction. Thank you. The case is submitted.
judges: Pillard; Wilkins; Katsas; Katsas; Rao; Rao